UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| MID-VALLEY PIPELINE CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 2: 11-235-DCR |
| | ) | |
| S. J. LOUIS CONSTRUCTION, INC., | ) | |
| | ) | |
| Defendant and Third-Party Plaintiff, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| SUNOCO PIPELINE, L.P., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

*** *** *** ***

This matter is pending for consideration of defendant S. J. Louis Construction, Inc.'s ("S.

J. Louis") motion to dismiss. [Record No. 14] S. J. Louis asserts that Defendant Mid-Valley

Pipeline Co. ("Mid-Valley") is not entitled to indemnification or reimbursement for any fines

imposed under the Clean Water Act. It also argues that Counts I and II of the Complaint — both

of which assert claims under common law negligence theories — are either preempted by federal

law or are otherwise inapplicable. Additionally, it contends that the claims outlined in Count

III seeking indemnification and contribution under Kentucky law are preempted by the Oil

Pollution Act of 1990. Therefore, it seeks to dismiss those claims that arise under Kentucky law,

so that the only issue remaining would be whether S. J. Louis was "solely responsible" for the

oil spill under the Oil Pollution Act. For the reasons explained below, the Court will grant the

motion in part, and Mid-Valley's claim for indemnification under Kentucky law will be dismissed.  Mid-Valley will be allowed to proceed on all other claims outlined in its Complaint.

## I.      Background

This case arose from the rupture of an oil pipeline ("the Pipeline") owned by Mid-Valley and extending from Texas to Ohio. [Record No. 1, ¶ 9]  A sewer pipe stretching through several counties in northern Kentucky intersects with the Pipeline in Burlington, Kentucky. [*Id.*, ¶¶ 10, 12]  In 2008, S. J. Louis was hired to work on a portion of the sewer pipe that runs through Burlington.  [*Id.*, ¶ 11] At their point of intersection, the sewer pipe runs beneath the Pipeline. Therefore, to reach the sewer pipe, S. J. Louis was required to excavate under the Pipeline "to the depth of approximately 20 feet below the ground surface."  [*Id.*, ¶ 12]  Mr. Williamson, a representative from Mid-Valley was present during the excavation, to advise S. J. Louis, monitor the proceedings, and take "certain steps to prevent damage to the [P]ipeline." [Record No. 14-1, p. 3]  However, according to the Complaint, "Mr. Williamson did not have control over the job site."  [Record No. 1, ¶ 18]

By early October, the digging had been completed with the Pipeline exposed.  On the morning of October 3, 2008, S. J. Louis employee James E. Robben was using a track hoe to finish-grade the bottom of the excavation site, when the "bucket of the track hoe curled, the boom of the track hoe rose, and the bucket struck the Pipeline, puncturing it."  [*Id.*, ¶¶ 20, 21, 25]  As a result, "over 150,000 thousand barrels of crude oil were released from the Pipeline." [*Id.*, ¶ 31]  Despite Mid-Valley's efforts to mitigate the environmental effects of the spill, "a substantial amount of crude oil was absorbed in 3,376 tons of soil" and a "minimal amount" of

oil entered Gun Powder Creek.  [*Id.*, ¶¶ 28-30, 32, 34] Because of S. J. Louis' actions, Mid-Valley has had to repair the Pipeline and engage in extensive remediation activities, including oil recovery efforts.  [*Id.*, ¶ 33-35]

To date, Mid-Valley has incurred costs of $1,271,869.56 to "repair the Pipeline, recover the spilled oil, remediate the environmental effects . . . and conduct emergency activities to contain the spilled oil." [*Id.*, ¶ 35]  It has "also incurred damages in the form of lost revenue and increased operating expenses." [*Id.*]  Additionally, due to the environmental impact of the spill, Mid-Valley has incurred Environmental Protection Agency ("EPA") fines under the Clean Water Act, in the approximate amount of $275,000.[1]  [*Id.*, ¶ 36]

Mid-Valley filed suit against S. J. Louis on September 22, 2011, to recover these costs. The Complaint contains three counts.  Count I asserts a claim under common law negligence. Count II asserts an alternative claim under a theory of *res ipsa loquitur* while Count III seeks indemnification under the Federal Oil Pollution Act.  [*Id.*, ¶¶ 37-49]  S. J. Louis filed its motion to dismiss these claims on October 14, 2011.  [Record No. 14]

Mid-Valley is pursuing this action under the theory that S. J. Louis punctured the Pipeline and, therefore, should bear all costs associated with the oil spill.  To that end, Mid-Valley has asserted a claim for damages under a negligence theory.  Additionally, it seeks indemnification and contribution from S. J. Louis under the relevant provisions of the Oil Pollution Act of 1990 ("OPA").  S. J. Louis seeks to dismiss the common law negligence counts of Mid-Valley's Complaint.  [Record No. 27, p. 12]  It argues that Mid-Valley is not entitled to recover fines

---

[1]      The final amount of this fine is still uncertain.  [*Id.*, ¶ 36 ("Mid-Valley has reached a tentative settlement with EPA for $275,000.")]

levied by the EPA under the Clean Water Act.  [Record No. 14-1, p. 5]  Moreover, it maintains

that Counts I and II – as well as the claims in Count III that rely on Kentucky law – are

preempted by the OPA.  Finally, it asserts that Mid-Valley has failed to state a claim for relief

under the doctrine of *res ipsa loquitur*.  [*Id.*, p. 11]

## II.     Legal Analysis

When evaluating a motion to dismiss under Rule 12(b)(6), the Court must determine

whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The plausibility standard is met "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Although

the complaint need not contain "detailed factual allegations" to survive a motion to dismiss, "a

plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels

and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555 (internal quotation marks and alteration omitted).

## A.     The Clean Water Act

Mid-Valley seeks damages from S. J. Louis for the fines it will be required to pay to the

EPA.[2]  However, S. J. Louis contends that these fines are not recoverable under the Clean Water

---

[2]     The EPA has demanded payment of these fines pursuant to section 1321(b)(7), which does not
contain any language providing for third-party liability.  Therefore, although the Complaint uses the statutory
language indicating that the fine is "due solely to the negligence of S. J. Louis," what it seeks is
reimbursement from S. J. Louis through contribution or indemnification, rather than subrogation under
section 1321(g), which only applies to removal costs incurred under section 1321(c).  [Record No. 1, ¶ 36]
The fact that Mid-Valley alleges that S. J. Louis is solely responsible for the spill, therefore, is irrelevant for
the purpose of determining whether it can seek to recover the EPA fines.

Act.  It asserts that "allowing a party to seek repayment of penalties it has been forced to pay defeats the purpose of the environmental statutes in question."  [Record No. 14-1, p. 5]

The Federal Water Pollution Control Act Amendments of 1972 ("FWCPA"), as amended by the Clean Water Act of 1977 ("CWA"), provide for civil penalties for owners or operators of vessels from which oil is accidentally discharged.  33 U.S.C. § 1251 *et seq.*  Under the CWA, any "owner, operator, or person in charge" of a facility from which a harmful quantity of oil is discharged into navigable waters, "shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil . . . discharged."  33 U.S.C. § 1321(b)(7)(A).  The CWA also contains a "savings clause," which preserves certain rights against third parties who might have caused or contributed to the discharge of oil:

> The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel or of an onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge, or . . .

33 U.S.C. § 1321(h).  The savings clause "preserves the right of contribution in favor of a discharger against a third party whose fault contributed to the discharge."  *United States v. Bear Marine Servs.*, 509 F. Supp. 710, 716 (E.D. La. 1980) (noting that this conclusion is supported "by both the clear language of the statute, and its legislative history"); *see Frederick E. Bouchard, Inc. v. United States*, 583 F. Supp. 477, 482 (D.C. Mass. 1984) ("The clear intent of this provision is to preserve pre-existing . . . remedies at least as against any non-discharging third party not solely responsible for causing an oil spill.").

S. J. Louis attempts to cabin the applicability of the savings clause in several ways.  First, it points to a decision from the Southern District of New York that interprets the term

"liabilities" to exclude any penalty imposed pursuant to Section 1321(b)(6).[3] [Record No. 14-1, p. 5 (citing *Tug Ocean Prince, Inc. v. United States*, 436 F. Supp. 907, 926 (S.D.N.Y. 1977))] However, as Mid-Valley points out, this interpretation was expressly rejected by the Second Circuit in *Montauk Oil Transportation Corp. v. Tug "El Zorro Grande"*. 54 F.3d 111, 113 (2d Cir. 1995). The court in *Montauk Oil* held that when a discharge is caused by the negligence of a third party, the responsible party may seek indemnification for civil penalty imposed as a result of the discharge. *Id.* at 113-15 ("The word 'liabilities' as used in section 1321(h) is broad enough to encompass the civil penalties that are imposed under section 1321(b)(6).").

According to S. J. Louis, allowing Mid-Valley to recover for its negligence would "negat[e] the very purpose of imposing the civil penalty in the first place." [Record No. 27, p. 9 ] It refers to a Ninth Circuit's decision in *Glacier Bay United Cook Inlet Drift Ass'n v. Trinidad Corp.* to support this argument. 71 F.3d 1447 (9th Cir. 1995). However, *Glacier Bay* is inapplicable. That case involved a lawsuit against the United States alleging negligence in the preparation of nautical charts. *Id.* at 1449. The plaintiffs in *Glacier Bay* attempted to assert that the term "third party" as used in section (h) could include the United States, but the Ninth Circuit rejected the argument based on the plain reading of the statute. *Id.* at 1455. Thus, the holding is simply not relevant to the claims and arguments presented here.

S. J. Louis also cites several cases that uphold an owner or operator's liability for an oil spill under section 1321(b), even where a third party's "act or omission was the immediate cause

---

[3] The case involves civil penalties assessed under section 1321(b)(7) rather than administrative penalties in subsection (b)(6). However, the Court agrees with Mid-Valley that there is no significant difference between these two provisions for the purposes of determining the scope of the term "liabilities" in section 1321(h). [*See* Record No. 26, p. 7 n.4]

of the spill." *E.g., United States v. Tex-Tow, Inc.*, 589 F.2d 1310, 1316 (7th Cir. 1978) (holding

that "an owner or operator of a discharging facility is liable to a section 1321(b)(6) civil penalty

even where it exercised all due care and a third party's act or omission was the immediate cause

of the spill").[4]   The reasoning behind these cases is not inconsistent with a conclusion that

section 1321(h) allows for the reimbursement of penalties from third parties.  The civil penalty

provision of the CWA provides for strict liability to ensure that fines are paid.  *See Montauk Oil*,

54 F.3d at 114; *United States v. Tex. Pipe Line Co.*, 611 F.2d 345, 347 (10th Cir. 1979); *United

States v. Egan Marine Corp.*, No. 08 C 3160, 2011 U.S. Dist. LEXIS 138087, at \*18 (N.D. Ill.

Oct. 13, 2011).  Fault is not a factor to consider when imposing fines upon the responsible party.

However, the issue of fault may allow the owner of a discharging facility to seek indemnification

or contribution from a third party.  *Montauk Oil*, 54 F.3d at 115.

In summary, the Court concludes that section 1321(h) recognizes the right to recover

penalties paid to the EPA under section 1321(b).  *See United States v. M/V Big Sam*, 681 F.2d

432, 435 n.2 (5th Cir. 1982).  Consistent with this conclusion, several courts have interpreted

section 1321(h) to ensure a right to reimbursement for fines imposed under the CWA, whether

by indemnification or contribution.  *See, e.g.*, *Bear Marine Servs.*, 509 F. Supp. at 716.

However, Section 1321(h) does not *create* a right to contribution or indemnity.  *Tetra

Tech., Inc. v. Kansas City Southern Ry. Co.*, 122 F. App'x 99, 102 (5th Cir. 2005); *Colorado v.*

---

[4]      S. J. Louis misrepresents the holding in *Tex-Tow*.  It writes that the Seventh Circuit "noted that prohibiting indemnity for penalties 'is consistent with the risk-shifting view of the civil penalty' that the oil company is in the best position to avoid the occurrence of spills." [Record No. 27, p. 9]  This quotation, which refers to *Tug Ocean Prince*'s later-rejected holding, is taken out of context.  In fact, the Seventh Circuit expressly refrained from deciding the question of "ultimate liability," stating that "Tex-Tow may still have an indemnity cause of action against Mobil under section 1321(h)." *Tex-Tow*, 589 F.2d at 1314.

*Asarco, Inc.*, 608 F. Supp. 1484, 1491 n.4  (D. Colo. 1985) (noting that there is "no case expressly articulating the source of the FWPCA's right to contribution").  Instead, a right to contribution or indemnification "may arise in either of two ways: first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or, second, through the power of federal courts to fashion a federal common law of contribution."  *Texas Indus. v. Radcliff Materials*, 451 U.S. 630, 638 (1981).  And because section 1321(h) does not create a right to contribution or indemnity, either expressly or by implication, *see Tetra Tech*, 122 F. App'x at 102, Mid-Valley's claim may proceed only if federal common law provides the cause of action.

Courts have the authority to formulate federal common law under limited circumstances. There are two main situations in which such circumstances arise: (1) when "Congress has given the courts the power to develop substantive law"; and (2) when "a federal rule of decision is 'necessary to protect uniquely federal interests.'"  *Texas Indus.*, 451 U.S. at 640 (internal citations omitted).  Regarding the first situation, courts generally look to statutory language and legislative history to determine if Congress intended the development of federal common law within a certain statutory scheme.  *Cf. Asarco*, 608 F. Supp. at 1489 ("It is clear from the legislative history [of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")] that contribution is one of the liability issues to be determined on a case-by-case basis through the common law process, rather than by specific statutory directive.").  In the context of "uniquely federal interests," the inquiry is even more restricted: "federal common law exists only in such narrow areas as those concerned with the rights and

obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Indus.*, 451 U.S. at 641; *see United States v. Kimbell Foods*, 440 U.S. 715 (1979) (explaining that federal programs "that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules.").

The provisions of the CWA that establish liability for the discharge of oil into navigable waters create just such a "narrow area." *Texas Indus.*, 451 U.S. at 641. The CWA is closely akin to CERCLA because the "pollution of land, groundwater, surface water and air as a consequence of . . . dumping presents potentially interstate problems." *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 808-09 (S.D. Ohio 1983) (finding that the "language of the two statutes addressing liability and contribution is strikingly similar"). And federal courts interpreting the liability provision of CERCLA have consistently concluded that "Congress did empower the federal courts to develop a common law of liability under CERCLA." *Asarco*, 608 F. Supp. at 1492; *see* 42 U.S.C. § 9607. Moreover, courts have relied on CWA jurisprudence in fashioning federal common law rules for contribution in CERCLA cases. *United States v. Conservation Chem. Co.*, 619 F. Supp. 162, 228 (W.D. Mo. 1985) (citing *Bear Marine Servs.*, 509 F. Supp. at 716; *In re Complaint of Berkley Curtis Bay Co.*, 557 F. Supp. 335, 339 (S.D.N.Y. 1983)). Based on these authorities, the Court concludes that there is a right to contribution under the CWA. The source of this right is, "as in CERCLA, the prevailing common law rule permitting contribution among joint tortfeasors." *Asarco*, 608 F. Supp. at 1491 n.4; *see also In re Complaint of Berkley Curtis Bay Co.*, 557 F. Supp. at 339 (noting that under

the CWA, "the party that pays for more than its share of fault will have an action for contribution from the party that pays for less than its share of fault"). This result comports with principles of equity because denying contribution to Mid-Valley would effectively immunize S. J. Louis from bearing the costs of non-compliance with the CWA, despite its potential liability. Therefore, Mid-Valley may seek to recover fines imposed by the EPA pursuant to section 1321(b)(7).

### B.      The Oil Pollution Act of 1990

In addition to the EPA fines discussed above, Mid-Valley seeks to recover the damages it suffered from the spill. Specifically, Mid-Valley asserts claims for indemnification and contribution under the Oil Pollution Act of 1990 ("OPA") and Kentucky law. [Record No. 1, ¶¶ 48, 49] S. J. Louis argues that the OPA preempts any action for indemnification or contribution under Kentucky common law because there is a conflict between the state and federal law and, therefore, Mid-Valley's negligence claim is "nullified by operation of the Supremacy Clause of the United States Constitution." [Record No. 14-1, p. 9]

The OPA provides that "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a). Mid-Valley concedes that it is a "responsible party" under the relevant definition.[5] [Record No. 1, ¶ 47] The OPA also provides for the liability of third parties under certain circumstances:

---

[5]      The term "responsible party" is defined as "any person owning or operating the pipeline." 33 U.S.C. § 2701(32)(E).

in any case in which a responsible party establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission of one or more third parties[6] . . . the third party or parties shall be treated as the responsible party or parties for purposes of determining liability.

33 U.S.C. § 2702(d)(1)(A).  Additionally, the OPA expressly allows a responsible party to seek contribution from third parties who are "potentially liable."  33 U.S.C. § 2709.

S. J. Louis asserts that the OPA preempts Mid-Valley's common law claims.  Like the CWA, the OPA contains a "savings clause," which provides that nothing in the Act should:

(1)     affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to —

(A)     the discharge of oil or other pollution by oil within such State; or

(B)     any removal activities in connection with such a discharge; or

(2)     affect, or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under . . . State law, including common law."

33 U.S.C. § 2718(a).

S. J. Louis concedes that the OPA does not expressly preempt state law causes of action. [Record No. 14-1, p. 8]  However, it contends that the OPA impliedly preempts the state common law claims in this case due to a conflict between the two.  A state law is preempted by federal law either: (1) "when compliance with both state and federal law is impossible"; or (2) when the state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

---

[6]     An "act or omission of a third party" is defined and limited in § 2703(a)(3).  However, a discussion of what is considered an act or omission under the OPA is not necessary for the purposes of this opinion.

S. J. Louis argues that conflict preemption bars Mid-Valley's state law claims.   It

maintains that Mid-Valley's claims would "supplant the requirement under . . . the OPA that, as

a responsible party, [Mid-Valley] is fully liable for the cleanup costs and the other damages

claimed unless it can establish that S.J. Louis is solely responsible for the Incident, and instead

replace that liability scheme with Kentucky's pure comparative fault regime." [Record No. 14-1,

p. 10]  With respect to Mid-Valley's claim for indemnification under Kentucky law, the Court

agrees.  To obtain indemnification under section 2702(d), Mid-Valley must prove that S. J. Louis

was solely at fault in causing the accident.   However, Kentucky has adopted a comparative

negligence standard that allows a plaintiff to recover the proportion of damages for which the

defendant is adjudged liable.  *See Hilen v. Hays*, 673 S.W.2d 713, 718 (Ky. 1984) (explaining

that comparative negligence "calls for liability for any particular injury in direct proportion to

fault").  To recover damages in this case, then, state law requires only that Mid-Valley prove that

S.J. Louis was somewhat at fault, while federal law requires Mid-Valley to prove that S.J. Louis

was completely at fault.  In other words, Kentucky law would award damages in some situations

in which the OPA would bar recovery.  This possibility, however remote, creates a conflict

between Mid-Valley's federal and state law claims.  *Cf. Bohrmann v. Maine Yankee Atomic

Power Co.*, 926 F. Supp. 211, 221 (D. Me. 1996) ("Plaintiffs' claim pursuant to a strict liability

theory is inconsistent with the federal regulatory scheme because Plaintiffs could recover

pursuant to such a claim without first establishing that Defendant breached a federally imposed

standard of care."); *McLandrich v. Southern California Edison Co.*, 942 F. Supp. 457, 465 (S.D.

Cal. 1996) ("[W]ith respect to the standard of care leading to liability, state law cannot be

followed to the extent that it gives either more or less protection to defendants than do the regulations."). Kentucky negligence law is contrary to section 2702(d), which imposes a higher burden on parties seeking indemnification for removal costs and damages. *See* 33 U.S.C. §§ 2702(d)(1), 2703(a)(3) (requiring that responsible party also establish that it "exercised due care" and "took precautions against foreseeable acts or omissions of any such third party"). As a result of this conflict, Mid-Valley's state law claim for indemnification is preempted and will be dismissed, at least inasmuch as Mid-Valley seeks indemnification for the damages it incurred due to the violation of the OPA.

Thus it remains for the Court to determine if the OPA preempts Mid-Valley's Kentucky law claim for contribution. S. J. Louis' arguments on this point are somewhat unclear, as they tend to conflate Mid-Valley's claim for indemnification with the claim for contribution. For instance, it asserts that Mid-Valley's only "mechanism to recover for remediation and other claims is through the [OPA], under which it is obligated to demonstrate that S. J. Louis was *solely* at fault." [Record No. 14-1, p. 14 (emphasis in original)]. It is true that Mid-Valley can only "exculpate itself from liability" by establishing that "the incident was caused solely by the actions of others." [*Id.*, p. 11 (emphasis omitted)] But exculpation and apportionment of fault are different concepts. If it fails to prove that S. J. Louis was solely at fault, Mid-Valley will not be entitled to indemnification under the OPA. But it does not follow that Mid-Valley would be unable to prove its right to contribution from S. J. Louis.

S. J. Louis also contends that the common law claim "conflict[s] with the goals and obstruct[s] the ends sought by Congress with the enactment of the OPA — namely holding

responsible parties 100% at fault unless an incident is solely caused by a third party." [Record No. 14-1, p. 11]   This argument is clearly inapplicable to the contribution claim.  The OPA expressly permits a responsible party that has paid removal costs or damages under the Act to "bring a civil action for contribution against any other person who is liable or potentially liable under this Act or another law."   33 U.S.C. § 2709.   This provision shows that there is no requirement under the OPA that the responsible party be *exclusively* liable, as S. J. Louis seems to imply.  The responsible party can be held liable under the OPA, yet also receive damages from a third party whose actions caused the oil spill.  Seeking contribution under Kentucky law does not create any "obstacle to the accomplishment of the full purposes and objectives of Congress" in enacting the OPA.[7]  *Silkwood*, 464 U.S. at 248.  Conflict preemption does not apply to nullify Mid-Valley's claims for contribution under Kentucky common law negligence principles.

S. J. Louis also requests that the Court adopt the reasoning from the Eastern District of Virginia case, *NSCSA v. Moran Mid-Atlantic Corp.*, in which the court concluded that the defendant was not entitled to bring a claim for contribution under state law. [Record No. 27, p. 3 (citing *Nat'l Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atl. Corp.*, 924 F. Supp. 1436, 1448 (E.D. Va. 1996))]  The *NSCSA* court determined that the savings clause of the OPA does not preserve the plaintiff's right to seek contribution under both the OPA and state law. *NSCSA*, 924 F. Supp. at 1448-49.  It concluded that the "purpose behind the savings clause is to allow the states to impose liability upon oil polluters above the liability imposed through

---

[7]     In fact, the legislative history behind section 2709 states that "[t]his section does not bar any action for contribution that is available under other law."  H.R. Rep. No. 101-653, 101st Cong., 2d Sess., at 11 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 789.

OPA." *Id.* at 1448.  This is not an unreasonable reading of the first part of the savings clause, which clearly provides a state with the power to impose "additional liability" for spills within that state.  33 U.S.C. § 2718(a)(1).  But the interpretation is incomplete because it ignores the second part of the clause.  When the *NSCSA* court reasoned that the savings clause was "not intended to affect liability between two vessels involved in an oil spill," it focused its analysis on subsection (a)(1) of the savings clause to the exclusion of subsection (a)(2), which provides that nothing in the Act shall "affect or modify in any way obligations or liabilities of *any person*."  33 U.S.C. § 2718(a)(2) (emphasis added).  If all Congress intended was to allow the states to enact legislation protecting their citizens, then the language of subsection (a)(2) would be superfluous.  It is a basic canon of statutory construction that when "construing a statute we are obliged to give effect, if possible, to every word Congress used."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).  Therefore, the Court concludes that, read as a whole, the savings clause does in fact preserve state laws, even those that shift the liability for the costs and damages associated with oil spills.  *See United States v. Locke*, 529 U.S. 89, 105 (2000) ("The evident purpose of the saving clauses is to preserve state laws which . . . establish *liability rules* and financial requirements relating to oil spills." (emphasis added)).

The Court also finds that *NSCSA* is distinguishable from the case at bar.  The plaintiff in *NSCSA* was the owner of a cargo vessel who sought to recover damages on the grounds that the defendant, the owner of a tug boat, was at fault in causing the oil spill.  *NSCSA*, 924 F. Supp. at 1440.  However, because the two boats involved in the collision were different sizes, the court

found that the plaintiff's recovery would be limited under the OPA.[8]   The plaintiff brought

counts under state common law in an attempt to avoid the liability limitation provision. *Id.* at

1446-47. To avoid nullifying the operative language of the OPA's liability limitation provision,

the district court held that the savings clause did not operate so as to allow the plaintiff to recover

the "full amount of its cleanup expenses" under a state law cause of action. *Id.* at 1446-49. The

Fourth Circuit affirmed, stating that if the plaintiff "could recoup its OPA liability costs through

state law claims as well as through OPA, the cap imposed by OPA . . . would be rendered

meaningless." *Nat'l Shipping Co. of Saudi Arabia v. Moran Trade Corp. of Del.*, No. 96-1741,

1997 U.S. App. LEXIS 23648, at *13 (4th Cir. Sept. 9, 1997).   In this case, however, the

limitation is the same for both Mid-Valley and S. J. Louis. 33 U.S.C. § 2702(d)(2)(b) (providing

that the "liability of a third party . . . shall not exceed the limitation which would have been

applicable to the responsible party"). Therefore, allowing a contribution action under Kentucky

law will not negate any provision of the OPA, and Mid-Valley's claims will be allowed to

proceed.

     This conclusion is also consistent with the difference in the procedural posture of these

two cases. The decision in *NSCSA* was issued after a bench trial on the merits, so there was far

more factual development before the decision. Thus, even if *NSCSA*'s interpretation of the

OPA's savings clause was correct, the holding does not necessarily apply to this case. It is still

---

[8]     The OPA contains a provision that limits liability for oil spills. Under this section, larger vessels are subject to greater liability than smaller vessels. *See* 33 U.S.C. § 2704(a). In other words, the total liability of a small vessel is capped at a lower dollar amount than the total liability of a large vessel. Because the defendant's tug was a smaller vessel than the plaintiff's tanker, it was subject to less liability than the plaintiff had been required to pay, as the responsible party. § 2702(d)(2)(A); *NSCSA*, 924 F. Supp. at 1440. Thus, the plaintiff in *NSCSA* could only recover a portion of its overall damages from the defendant.

unclear at this point in the litigation which portions of Mid-Valley's damages claimed arose from the OPA, which arose under state law,[9] and which are direct damages flowing from the accident itself (*e.g.*, lost revenue and repairs to the pipeline).  In *NSCSA*, the district court proposed a hypothetical case in which a responsible party would be allowed to seek contribution against a negligent third party under state law: if part of the responsible party's liability was imposed under state law, then the court agreed that state law could be used to recover that portion of the liability.  *NSCSA*, 924 F. Supp. at 1449.  At the very least, more factual development is needed to determine if this is a "pure OPA case," or if some of Mid-Valley's liability was derived from state law.  *Id.*  Therefore, Mid-Valley's claim for contribution under Kentucky law will survive this motion to dismiss.[10]  [Record No. 1, ¶ 49]

This leaves the question whether Mid-Valley is entitled to rely on Kentucky common law negligence principles when seeking contribution under the OPA.  The Court holds that, based on the plain language of the statute, it is.  The OPA expressly provides for a right to contribution if a third party is liable under either the OPA itself of "another law."  33 U.S.C. § 2709; *see also NSCSA*, 924 F. Supp. at 1450-51 (using general maritime law as "another law" to determine if defendant was liable for the purposes of OPA contribution).  Read together with the savings clause, it is reasonable to conclude that Congress intended courts to look to state common law to determine whether a third party was liable for the purposes of contribution under section 2709.

---

[9]     For instance, the Complaint indicates that Mid-Valley worked with the Environmental Response Unit at the Kentucky Department of Natural Resources, as well as the Kentucky Department of Disaster and Emergency Services.  [Record No. 1, ¶ 30]  It is unclear from the Complaint if any portion of the damages sought by Mid-Valley stem from Kentucky regulations.

[10]     For the reasons articulated above, Mid-Valley will also be allowed to proceed on Counts I and II of its Complaint.

### C.     Res Ipsa Loquitur

Finally, S. J. Louis contends that Mid-Valley has failed to state a claim under the Kentucky common law theory of *res ipsa loquitur*. To prove entitlement to damages under this theory, a plaintiff must demonstrate: (1) the instrumentality must be "under the control or management" of the defendant; (2) the "circumstances, according to common knowledge and experience, must create a clear inference that the accident would not have happened" had the defendant not been negligent; and (3) the plaintiffs injury resulted from the accident. *Barnes v. Otis Elevator Co.*, 2 F. App'x 461, 467 (6th Cir. 2001).

Accepting all facts pleaded in the Complaint as true, the first and third elements are clearly met. The instrumentality, namely the track hoe,[11] was under the control of an S. J. Louis employee, Mr. Robben,[12] when the accident occurred. [Record No. 1, ¶¶ 20, 22-25] Mid-Valley's injury resulted from the puncturing of the Pipeline. [*Id.*, ¶¶ 1, 28-36] The question, therefore, is whether the circumstances create an inference that the accident would not have happened but for S. J. Louis's negligence. The Court finds that the allegations of the Complaint are sufficient to create such an inference. According to the Complaint, the Pipeline was completely exposed, so that "Mr. Robben could see to the bottom of the excavation with the

---

[11]     The Court agrees with Mid-Valley that "S. J. Louis's assertion that '[t]he instrumentality that caused the damages was the leaking pipeline' defies common sense." [Record No. 26, p. 17] Mid-Valley seeks damages from S. J. Louis for its negligence in puncturing the Pipeline. It is unreasonable to assert that the injured property is also the "instrumentality."

[12]     S. J. Louis's discussion of the duty to warn is not relevant to the issue of control for *res ipsa loquitur* purposes, because a duty to warn does not translate into control over the people warned. Moreover, as Mid-Valley points out, the Court must accept the Complaint's allegations to be true and the Complaint alleges that its employee did not have any control over S. J. Louis's employees nor did he act as a spotter. [Record No. 1, ¶ 16-18, 22] Therefore, S. J. Louis's discussion of the duty to warn is a digression with no bearing on this motion to dismiss.

Pipeline in full, unobstructed view." [*Id.*, ¶ 24]  As a result, it is reasonable to infer that the track hoe would not have punctured the Pipeline without some negligence on the part of Mr. Robben or S. J. Louis.

### III.    Conclusion

Mid-Valley's claim for indemnification under Kentucky law is preempted by the OPA. Mid-Valley will be allowed to proceed on all other claims asserted in its Complaint. Accordingly, it is hereby

**ORDERED** as follows:

(1)    Defendant S. J. Louis Construction, Inc.'s Motion to Dismiss [Record No. 14] is **GRANTED**, in part.

(2)    Mid-Valley Pipeline Co.'s claim for indemnification under Kentucky law is dismissed with respect to any damages incurred under the Oil Pollution Act of 1990.

(3)    Defendant S. J. Louis Construction, Inc.'s motion to dismiss is **DENIED** with respect to all other claims.

This 24th day of January, 2012.



Signed By:
*Danny C. Reeves*   DCR
United States District Judge